[605 NYS2d 777]

MIRIAM FELDMAN, Respondent-Appellant, v RICHARD FELD-
MAN, Appellant-Respondent.

Second Department, December 27, 1993

---

**APPEARANCES OF COUNSEL**

*Willard H. DaSilva,* Garden City *(Richard J. Keidel* of counsel), for appellant-respondent.

*Gassman Fisher & Fass,* Garden City *(Stephen Gassman* and *Barry J. Fisher* of counsel), for respondent-appellant.

**OPINION OF THE COURT**

EIBER, J.

The plaintiff wife and the defendant husband were divorced in January 1991 after nearly 40 years of marriage. During the parties' marriage, the husband worked in his father's business, gradually assuming increasing responsibility for its day-to-day operations, while the wife assumed the traditional role of housewife and mother. At issue on this appeal is whether the Supreme Court properly determined that certain property acquired by the husband through gifts and bequests remained his separate property, even though some separate funds were initially commingled with marital funds, or used for the support of both parties. Also at issue on appeal is the propriety of several provisions of the judgment of divorce which relate to the husband's financial obligations to the wife. For the reasons which follow, we find that the court properly determined that the property to which the husband had title at the time of the trial was separate property not subject to equitable distribution. We find, however, that under the circumstances of this case, the judgment should be modified, *inter alia,* to reduce the amount of permanent maintenance awarded to the wife.

I

The plaintiff Miriam Feldman and the defendant Richard

Feldman were married on December 23, 1953, shortly after the husband graduated from Brown University, and the wife graduated from Pembroke College. Following the couple's marriage, the husband began graduate studies at Hofstra University in furtherance of his goal of pursuing an academic career. In 1954, however, the husband was drafted into the United States Army, and served in the military for two years. The parties' first child was born in December 1955 and the husband was discharged from the Army eight months later, in July 1956. Following his discharge, the husband accepted an offer to work in his father's business, the Woodhaven News Company, which was engaged in the distribution of newspapers in Brooklyn and Queens. Although the husband was appointed vice-president of the close corporation shortly after his employment commenced, he started at "the bottom of the barrel", and was initially required to sweep floors and fill trucks with gasoline. However, ultimately he learned every aspect of the newspaper distribution business.

In 1958, the husband's father, Alexander Feldman, formed a new corporation, Crescent News Distributors, Inc. (hereinafter Crescent News), to distribute newspapers and magazines to a wider geographical area including Nassau and Suffolk Counties. Shortly after Crescent News was formed, Alexander Feldman gave his son 30% of the company's outstanding shares, retaining a 70% interest in the business for himself and his wife. Thereafter, from 1958 to 1976, when the Woodhaven News Company ceased doing business, the husband was employed by both companies.

In the 1960's, the couple purchased a home in Great Neck, New York, and their second child was born in 1964. During this period, the wife, who was never employed outside the parties' home during the marriage, was the primary caretaker of the children, and was responsible for most of the household tasks, including cooking and cleaning for her family.

In 1963, Crescent News purchased a five-acre parcel of vacant land in Ronkonkoma, New York. This parcel was never developed, and the husband's duties regarding the property consisted of visiting it periodically to ensure that no hazardous conditions had developed, and that no garbage had been dumped on the property. Four years later, Crescent News also purchased two contiguous parcels of property in Deer Park, New York, for a total of $168,900. At the time of the purchase, an 8,000-square-foot concrete building was in the process of being constructed on one of the Deer Park parcels, and

upon its completion, Crescent News rented the building to a moving and storage company under a net lease agreement. Pursuant to the net lease agreement, the tenant assumed responsibility for repairs and maintenance, and was obligated to pay property taxes. The husband's duties with respect to the Deer Park property consisted of visiting the tenant on the "fairly rare" occasions that it did not pay the rent, and periodically stopping by the premises to "see that everything was being taken care of".

In May 1981 the husband and his father sold Crescent News to a competing company. Under the terms of the sale agreement, the new shareholders of the corporation agreed to employ the husband as a senior executive officer for a six-month period at a salary of $36,000. The company further agreed to employ the husband as a consultant for an additional 4½-year period, at an annual salary of $57,555. As a result of the sale, the Deer Park and Ronkonkoma parcels owned by Crescent News were conveyed to the husband and his father as tenants in common, with the husband acquiring a 30% interest in the parcels, and Alexander Feldman acquiring a 70% interest in the property. After his six-month employment contract with the company expired, the husband was given no work to do, but he continued to support his family with his salary as a consultant. Although he subsequently obtained a real estate license and worked for a Great Neck broker during the summer of 1984, he made no sales and thus earned no commissions.

The early 1980's were difficult years for both parties, and their relationship deteriorated during this time, ultimately leading to their separation. The husband lost his mother on September 12, 1982, and his father died shortly thereafter, on March 16, 1983. Moreover, both parties suffered from physical ailments and psychological problems. In 1982 and 1984, the wife, who suffers from a degenerative spinal condition, was hospitalized for lower back pain. Her weight dropped to 80 pounds, and she was diagnosed as suffering from Crohn's disease. She was also hospitalized, *inter alia,* for depression in 1984, and she continues to receive psychiatric treatment. Meanwhile, the husband suffered a ruptured appendix, and was hospitalized from July 30, 1983 to August 21, 1983. In 1985, the husband was also hospitalized for psychiatric treatment, and he continues to see a psychiatrist on a weekly basis.

When the parties separated in 1985 their liquid assets consisted primarily of $275,000 in United States Treasury

bills, some of which had been placed in the wife's sole name, and some of which had been placed in joint name ownership. These Treasury bills had been purchased, in part, with two payments, totaling $90,000, which the husband received from the estates of his parents in July and August 1983. The husband ultimately received a total of $262,302 from his parents' estates, and earned executor's fees in excess of $50,000. Upon his father's death, the husband also inherited Alexander Feldman's 70% interest in the Deer Park and Ronkonkoma properties. The husband sold the Deer Park property in 1985 for the sum of $725,000, taking back a four-year purchase-money mortgage in the sum of $475,000. During the four-year period following the sale, the husband used the proceeds of the Deer Park mortgage to pay debts, purchase Treasury bills, and make deposits into a money-market account. When the final balloon payment on the mortgage came due in May 1989 he received a final payment of $213,916.67.

The husband also sold the Ronkonkoma property in 1986, for the sum of $440,000. The sale of the Ronkonkoma property was partially financed by a purchase-money mortgage in the sum of $317,500, and at the time of trial in 1990, he was receiving interest payments of 12% on this principal sum. A balloon payment of $317,500 was scheduled to be made in January 1991.

In April 1986 the wife sold the $275,000 in Treasury bills belonging to the parties and borrowed $5,000 from the husband in order to purchase a two-bedroom condominium at Acorn Ponds in Roslyn, New York. The couple then sold their Great Neck home for the sum of $660,000, dividing the proceeds equally in accordance with a written agreement. Pursuant to the agreement, from her share of the proceeds the wife repaid the husband the $5,000 she had borrowed from him, as well as the sum of $137,500, which represented one half of the parties' Treasury bills. Shortly thereafter, the husband purchased and moved into a furnished cooperative apartment in the North Shore Towers, paying for the apartment with proceeds from the sale of the Deer Park property. With the remaining funds from the sale of the Deer Park and Ronkonkoma properties, and from the sale of the marital residence, the husband purchased Treasury bills in his name, and supported himself and his wife.

When questioned at the trial about the source of the $6,057.25 balance in his Citibank checking account, the $9,548 balance in his Citibank savings account, the $5,825 balance in

his Chemical Bank checking account, and the $8,667 balance in his Chemical Bank savings account, the husband could not state whether or not these funds came from solely inheritance or gift. With respect to his Citibank checking account, he explained that "because of my poor bookkeeping, it could be partially from the sale of the land, it could be from inheritance or gift. It could have been from my consultant fee and been sitting there. I really do not have any method of pegging the deposits". The husband maintained, however, that none of the proceeds from the sale of the Deer Park or Ronkonkoma properties was placed in joint accounts with his wife. Moreover, although the first $90,000 in distributions which the husband received from the estates of his mother and father in the summer of 1983 was placed in a joint bank account, the husband maintained that he deposited all the remaining estate funds, which he received in 1984, in his individual bank accounts. Ultimately, the husband used a conglomerate of the proceeds from the sale of the marital residence and the Deer Park property to purchase a total of $810,000 in Treasury bills, to which he held sole title. By the time of trial, however, the husband had reduced his total holdings in Treasury bills to $760,000, in part to satisfy a tax debt arising from the disallowance of a previously claimed tax shelter.

The evidence presented at the trial also revealed that while the husband remained unemployed following his unsuccessful stint as a real estate broker, he reported unearned taxable income of $133,493 in 1987, and unearned taxable income of $328,299 in 1988. Although the husband had not yet filed an income tax return for 1989 at the time of the trial, his accountant projected that his income for 1989 from all sources, including the Ronkonkoma mortgage, would be $125,244. In contrast, in 1988 the wife reported unearned income of $14,661, and in 1989 she reported unearned income of $19,519. The parties' statements of net worth indicated that the husband's assets, including his cooperative apartment, interest in mortgages, and Treasury bills, totaled approximately $1,500,000, while the wife's assets, including her condominium apartment, totaled approximately $500,000.

At the conclusion of the trial, the Supreme Court found, based upon the conduct of the parties, that the $275,000 in Treasury bills divided by the parties in 1986, as well as the equity in the former marital residence, "constituted marital assets and as divided between the parties now constitute their separate property". However, the court found that since "sub-

stantially all of the assets as now titled in the defendant's name were either received by him as inter vivos gifts or by inheritance from his parents", those assets constituted separate property in which the plaintiff wife had no interest. Moreover, the court concluded that the wife had no interest in the appreciation in value of the husband's separate property, because there was no evidence that she contributed in any way to the property's appreciation. The court further awarded the wife lifetime maintenance in the sum of $1,000 per week in order to enable her to "maintain a standard of living substantially similar to that enjoyed by the parties" prior to their separation. The court additionally directed the husband to maintain in full force and effect a life insurance policy for the sole benefit of the wife, with a total death benefit of no less than $550,000, and to continue to maintain existing health and hospital care coverage for her benefit. Finally, the husband was directed to pay the wife the sum of $32,000 as his contribution to the legal expenses incurred by her in prosecuting this action.

Both the husband and wife now appeal.

## II

On appeal, the wife contends that all of the husband's assets, except for his 70% inherited interest in the Ronkonkoma property, should be considered marital property subject to equitable distribution. In support of her claim, the wife asserts that the testimony of the parties "revealed that unquantified inherited funds were commingled with unquantified marital funds acquired from various sources", thus making identification of marital and separate funds virtually impossible. The wife additionally submits that the husband's actions in placing separate property in joint accounts clearly reflected his intention to make a gift to her, and that the appreciation of the husband's 70% inherited interest in the Deer Park property is marital property since its appreciation was due, in part, to her contribution and efforts.

Our analysis of the wife's contentions must begin with a consideration of Domestic Relations Law § 236 (B), which creates two distinct categories of property: marital property, which is subject to equitable distribution, and separate property, which is not (see, Price v Price, 69 NY2d 8, 11). The statute defines the term "marital property" to include "all property acquired by either or both spouses during the mar-

riage" (Domestic Relations Law § 236 [B] [1] [c]), and the Court of Appeals has held that the term marital property must be construed broadly so as to give effect "to the concept that marriage is an economic partnership" *(Sclafani v Sclafani,* 178 AD2d 830, 831, citing *Price v Price, supra,* at 15). Separate property, which must be more narrowly construed, includes property "acquired before marriage or property acquired by bequest, devise, or descent, or gift from a party other than the spouse" (Domestic Relations Law § 236 [B] [1] [d] [1]; *see, Price v Price, supra).* Separate property also includes "property acquired in exchange for or the increase in value of separate property, except to the extent that such appreciation is due in part to the contributions or efforts of the other spouse" (Domestic Relations Law § 236 [B] [1] [d] [3]).

In the case before us, the husband unequivocally testified that the 30% interest he received in Crescent News was a gift, and the wife presented no evidence to rebut his testimony or otherwise demonstrate that the shares of stock were in reality employment compensation which the husband would not have received had he not accepted his father's offer to work in his company. Accordingly, both the husband's 30% interest in the corporation, and the 30% interest in the corporation's real property which the husband acquired upon the sale of Crescent News in 1981, were separate property upon their receipt *(see, Harned v Harned,* 185 AD2d 226, 228; *cf., Sclafani v Sclafani, supra; Hackett v Hackett,* 147 AD2d 611). Moreover, it is clear that under the Domestic Relations Law, the money and interest in real property which the husband inherited from his parents initially constituted his separate property *(see, Robertson v Robertson,* 186 AD2d 124; *Nalbandian v Nalbandian,* 135 AD2d 621).

Having determined that the property acquired by the husband through inter vivos gift and inheritance constituted his separate property upon receipt, we turn now to the wife's claim that the funds which the husband derived from separate property should be considered marital property because the funds were commingled with marital funds and, in some instances, placed in joint accounts. Contrary to the wife's contention, however, the record does not demonstrate that the funds received by the husband through gift and inheritance were transmuted into marital property by the actions of the parties. While the record reveals that the two payments, totalling $90,000, which the husband received from his parents' estates in the summer of 1983 were deposited in a joint

bank account, these funds were ultimately used to purchase the $275,000 worth of Treasury bills which the parties agreed to equally divide in 1986. However, the husband placed the remaining funds distributed from his parents' estates, as well as the proceeds derived from the sale of the Deer Park and Ronkonkoma properties, in his individual bank accounts. This case is thus distinguishable from *Di Nardo v Di Nardo* (144 AD2d 906), in which the Appellate Division, Fourth Department, concluded that a $34,217 check which the defendant husband received from his mother's estate was marital property. The *Di Nardo* Court noted that, although the funds were separate property when received, the defendant converted the funds to marital property when he commingled it with other assets in a joint account where it remained for seven years. In contrast, in the case before us, the fact that a portion of the husband's inherited funds were deposited in a joint account does not support the further inference that the husband intended to treat all subsequently received funds, which were placed in his individual bank accounts, as marital property *(cf., McSparron v McSparron,* 190 AD2d 74; *Glazer v Glazer,* 190 AD2d 951, 953).

We further conclude that the record does not support the wife's claim that separate funds were commingled with marital funds to such an extent that they lost their separate identity. While the wife points to the husband's admission that he was a poor record keeper, and that he could not unequivocally state that the funds in certain of his smaller checking and savings accounts were derived solely from gift or inheritance, it is clear, as the Supreme Court found, that the vast majority of assets to which the husband had title at the time of the trial were in fact acquired through inter vivos gifts and bequests from his parents. Indeed, in view of the wife's testimony that the $275,000 worth of Treasury bills which the parties agreed to divide in 1986 constituted all of their joint liquid assets at that time, it is clear that the $760,000 in Treasury bills which the husband owned at the time of the trial were purchased in large part with funds derived from the sale of the Deer Park property, the satisfaction of the Deer Park mortgage in 1989, and the sale of the Ronkonkoma property *(see, Sarafian v Sarafian,* 140 AD2d 801, 804). We additionally note that the husband's admission that he drew upon bank accounts containing separate funds to pay bills and support both parties does not change the nature of the funds.

We further find unpersuasive the wife's contention that

she is entitled to a share of the appreciation of the husband's 70% inherited interest in the Deer Park property, which was purchased in 1967 for $168,900, and sold in 1985 for $725,000. It is by now well settled that under the Equitable Distribution Law, an increase in the value of separate property of one spouse during the marriage, which is due in part to the indirect contributions or efforts of the other spouse as home-maker and parent, should be considered marital property *(see, Price v Price,* 69 NY2d 8, *supra)*. Whether the assistance of a nontitled spouse can be said to have contributed in part to the appreciation of an asset depends, however, "primarily upon the nature of the asset and whether its appreciation was due in some measure to the time and efforts of the titled spouse" *(Price v Price, supra,* at 18). Where such appreciation "is not due, in any part, to the efforts of the titled spouse but to the efforts of others or to unrelated factors including inflation or other market forces, as in the case of a mutual fund, an investment in unimproved land, or in a work of art, the appreciation remains separate property, and the nontitled spouse has no claim to a share of the appreciation" *(Price v Price, supra,* at 18). In the instant case, the record discloses that a commercial building was in the process of being erected upon the Deer Park property when Crescent News purchased the land in 1967, and that after completion of the building, the parcel was rented to a long-term tenant under a net lease agreement, which required the tenant to defray all expenses connected to the upkeep of the premises, including taxes, maintenance, and repairs. The husband's only contribution to the management of the property consisted of periodic visits to the tenant on the few occasions when rent payments were late, and periodic visits to ensure that the tenant was taking care of the premises. Under these circumstances, it cannot be said that the substantial increase in the value of the property was due to the husband's efforts rather than to market forces and inflation. Accordingly, the Supreme Court properly deter-mined that the appreciation in value of the Deer Park prop-erty constituted the husband's separate property.

### III

■ Turning next to the issue of spousal maintenance, the husband asserts that the Supreme Court's award of lifetime maintenance to the wife in the sum of $1,000 per week exceeds both his ability to pay and his wife's reasonable needs. It is well established that the amount and duration of mainte-

nance is is a matter committed to the sound discretion of the trial court *(see, Wilner v Wilner,* 192 AD2d 524; *Loeb v Loeb,* 186 AD2d 174). In fixing the amount of such an award, a court must take into account the financial circumstances of both parties, including their reasonable needs and means *(see, Raviv v Raviv,* 153 AD2d 932; *Foy v Foy,* 121 AD2d 501). A court must also consider the paying spouse's present and anticipated income, the payee spouse's present and future earning capacity, and both parties' preseparation standard of living *(see, Raviv v Raviv, supra).*

Applying these principles to the instant case, we note that the Supreme Court did not improvidently exercise its discretion in awarding the wife lifetime maintenance. In light of the long duration of the parties' marriage, and the fact that the wife, who is now 61 years old, is in poor health, has never worked outside the home, and has no marketable skills, an award of permanent maintenance is clearly appropriate *(see, Sperling v Sperling,* 165 AD2d 338; *see also, Wilner v Wilner, supra).* However, the husband is also 61 years old, has not actually worked since the buyout of the family business in 1981, and, like the wife, has experienced physical ailments and has required regular psychiatric treatment and counseling. There is thus little likelihood that the husband will be able to reenter the work force. Moreover, while the husband was receiving certain mortgage payments in connection with the sale of the Ronkonkoma property at the time of trial, a balloon payment satisfying the mortgage was due in January 1991. It is thus apparent that the husband will be required to support both himself and the wife on the basis of the fluctuating income he receives from his investments. Under these circumstances, and taking into account the reasonable needs of both parties, we find it appropriate to reduce the husband's maintenance obligation to the sum of $650 per week. Moreover, while the Supreme Court properly awarded the wife the difference in the permanent maintenance and the pendente lite maintenance retroactive to the date of application for pendente lite maintenance *(see,* Domestic Relations Law § 236 [B] [6]; *Sotiropoulos v Sotiropoulos,* 181 AD2d 499; *Thomas v Thomas,* 161 AD2d 1151; *Bonheur v Bonheur,* 141 AD2d 489, 490), in view of our determination reducing the permanent maintenance below the pendente lite award, the retroactive maintenance award must be vacated.

█ We find, however, no merit to the husband's argument that the Supreme Court erred in directing him to continue to

provide the wife with health and hospital insurance coverage coterminous with his obligation to provide maintenance. The court is empowered to require that one party provide medical insurance for the other (see, Domestic Relations Law § 236 [B] [8]), and in view of the wife's poor health and the husband's greater assets, the court properly directed the husband to maintain existing coverage for the wife's benefit. While it was also proper for the court to direct the husband to maintain a life insurance policy designating the wife as beneficiary (see, Burns v Burns, 193 AD2d 1104), the court's direction that this policy provide the wife with a total death benefit of no less than $550,000 was based on the court's erroneous finding that the husband had an existing term life insurance policy providing an $800,000 death benefit. Although the husband's testimony in this regard was somewhat unclear, the parties concede on appeal that the subject policy in fact provided a total death benefit of $400,000. Since insurance coverage in the sum of $400,000 would be sufficient to meet the wife's needs in the event of the husband's death, we modify the judgment of divorce to require that the husband maintain in full force and effect his existing term life insurance policy providing the wife with a death benefit of $400,000.

We decline to disturb the Supreme Court's award of $32,000 in counsel fees to the wife, which represents her remaining obligation to her attorneys. The determination of what constitutes reasonable counsel fees is committed, in the first instance, to the sound discretion of the trial court, which is in a far "superior position to judge those factors integral to the fixing of counsel fees, such as the time, effort and skill required" (Levine v Levine, 179 AD2d 625, 626; see, DeCabrera v Cabrera-Rosete, 70 NY2d 879, 881; Lefkowitz v Van Ess, 166 AD2d 556). Taking into account the disparity in the parties' financial circumstances, the duration of the litigation, the nature of the assets involved in this case, and the time expended by the wife's attorneys, we find that the counsel fee award was not improvident.

Accordingly, the judgment is modified, on the facts and as a matter of discretion, by (1) deleting so much of the second decretal paragraph thereof as directed the defendant to pay to the plaintiff maintenance in the sum of $1,000 per week, and substituting therefor a provision directing the defendant to pay the plaintiff maintenance in the sum of $650 per week, (2) deleting so much of the fourth decretal paragraph thereof as directed that the defendant maintain, in full force and effect,

a policy of life insurance for the sole benefit of the plaintiff, with a total death benefit of not less than the sum of $550,000, and substituting therefor a provision directing the defendant to maintain in full force and effect a policy of life insurance for the sole benefit of the plaintiff, with a total death benefit of not less than $400,000, and (3) deleting the seventh decretal paragraph thereof. As so modified, the judgment is affirmed insofar as appealed from, without costs or disbursements, and the matter is remitted to the Supreme Court, Nassau County, for entry of an appropriate amended judgment. The appeals from the decision and the order are dismissed, without costs or disbursements, as no appeal lies from a decision or from an order amending a decision *(see, Schicchi v Green Constr. Corp.,* 100 AD2d 509; *Behrens v Behrens,* 143 AD2d 617).

MANGANO, P. J., BALLETTA and RITTER, JJ., concur.

Ordered that the appeals from the decision and the order are dismissed, without costs or disbursements; and it is further,

Ordered that the judgment is modified, on the facts and as a matter of discretion, by (1) deleting so much of the second decretal paragraph thereof as directed the defendant to pay to the plaintiff maintenance in the sum of $1,000 per week, and substituting therefor a provision directing the defendant to pay the plaintiff maintenance in the sum of $650 per week, (2) deleting so much of the fourth decretal paragraph thereof as directed that the defendant maintain, in full force and effect, a policy of life insurance for the sole benefit of the plaintiff, with a total death benefit of not less than the sum of $550,000, and substituting therefor a provision directing the defendant to maintain in full force and effect a policy of life insurance for the sole benefit of the plaintiff, with a total death benefit of not less than $400,000, and (3) deleting the seventh decretal paragraph thereof; as so modified, the judgment is affirmed insofar as appealed from, without costs or disbursements, and the matter is remitted to the Supreme Court, Nassau County, for entry of an appropriate amended judgment.