OPINION OF THE COURT
Kenneth R. Fisher, J.
Plaintiff shall have a divorce pursuant to Domestic Relations Law § 170 (7). Defendant’s counterclaim fails for want of proof.
Custody of the two minor children was settled by execution of an agreement for joint shared custody dated June 16, 2014, which was made a temporary order of the court. That agreement is hereby made an order of permanent custody and visitation. (Exhibit No. 2.)
Under this agreement, a two-week rotating schedule was established whereby the father enjoys four nights in week one and three nights in week two, and the mother enjoys three nights in week one and four nights in week two. Inasmuch as the court must look to the overnights in calculating which par *654 ent has residence most of the time (Rubin v Della Salla, 107 AD3d 60, 69-70 [1st Dept 2013] [“the number of overnights, not the number of waking hours, is the most practical and workable approach”]), it is evident that this is a truly 50-50 shared agreement. Accordingly, “the parent with the higher income, who bears the greater share of the child support obligation, in this case the father, should be deemed the noncustodial parent for the purpose of support.” (Barr v Cannata, 57 AD3d 813, 814 [2d Dept 2008]; see Eberhardt-Davis v Davis, 71 AD3d 1487, 1487-1488 [4th Dept 2010]; Matter of Moore v Shapiro, 30 AD3d 1054, 1055 [4th Dept 2006].)
The parties have a complicated employment history, a central feature of which is plaintiffs inherited deaf condition for which she receives Social Security disability (SSD) income on behalf of herself and her children. (Exhibit No. 6.) Plaintiff also receives additional income teaching classes at the University of Rochester (U of R), Rochester Institute of Technology (RIT), and as an evaluator for the American Sign Language Teachers Association. (Exhibit No. 8.) Plaintiff must limit her supplemental income by virtue of a regulatory $1,070 cap. (42 USC § 423 [d]; 20 CFR 404.1574.) Plaintiff left her job in 2006, by mutual agreement of the parties, to help defendant’s new business (after his prior business, Nakis Autocare, Inc. filed for bankruptcy) via caring for a learning delayed son. The new business, Rookies Neighborhood Sports Bar (Rookies I), was formed with equal $117,000 contributions from defendant, his cousin (Gus Votsis) and a third investor. Defendant financed his portion via an additional loan against the marital residence, then his separate property, in the amount of $80,000, and the sale of farmland defendant previously purchased from his father. The sale was shown to have been made at a $23,000 loss. Despite full payment, defendant never executed an equal partnership agreement nor were any partnership, corporate or LLC agreements drawn up of which concerned defendant.
The other investors forced defendant out of this business in 2008 when the state sales tax authorities began an investigation. Defendant offered no proof of an effort to protect his interest in the business, and instead claimed that, by reason of a dispute with his cousin, he filed an IRS whistleblower application, the details of which were never explained at the trial. The business remains ongoing, however.
Two years later, defendant began a third business with the third investor, called Rookies Sports Bar and Grill (Rookies II). *655 Although no funds were invested, defendant was elected president of Halftime, Inc., the owner of Rookies II, and he claimed at trial to have signed a partnership agreement. Again, despite due discovery demand, no documentation of this third business was produced at trial except a Halftime corporate record book, which contained no reference to the claimed agreement. The above history of sales tax violations eventually carried forward to this third business, which was sold in 2011 to an insolvent buyer, which declared bankruptcy before making any payments.[1]
Given the abundant proof of marital waste and dissipation of assets, the extent of which must be inferred to be greater than that defendant accounted for in his trial testimony (numerous discovery requests aimed at nailing the matter down were not heeded by defendant), CPLR 3126, and the numerous mistakes and omissions on defendant’s statement of net worth (SNW), admitted on cross-examination, the court is not bound to accept defendant’s account of his finances.
This and other history of egregious misconduct (detailed below) warrants imputation of income to defendant above his “reported” income (defendant’s SNW failed to declare any income). According to defendant’s paystub, defendant makes $13.50 per hour at Autozone and $20.25 per hour for overtime worked. Defendant admitted at trial that, despite his varying deposition testimony, he works 8.5 hours overtime a week. (Exhibit No. 1 at 9-10; exhibit K [Autozone earning record].) Defendant also has significant undisclosed sources of income, as evidenced by over $10,000 in deposits into his account in the last nine months of the statement period evidenced in exhibit No. 5. Defendant’s failure to declare this source of his additional income warrants imputing at least a $10,000 yearly income in excess of his Autozone income.
Annualizing defendant’s biweekly Autozone income of $1,000 (regular) and $344.25 (overtime) for a total of $1,424.25 results in an annual figure of $37,030.50, less FICA of $2,428.92, for a total of $34,601.58, to which $10,000 must be added, yielding a Child Support Standards Act (CSSA) (Domestic Relations Law § 240 [1-b]) income figure of $44,601.58, or $44,602 rounded.
Plaintiffs income consists of $1,767 monthly in Social Security disability payments together with limited outside income *656 from the U of R and RIT, up to $1,070 yearly according to plaintiff, for a total yearly figure of $22,273 (calculated using $1,069 as the outside income figure). The record shows, however, that plaintiff is capable of working full time, as her past employment history shows. She testified that her old position at the U of R has been filled and that her efforts with two other unspecified employers have failed. Accordingly, this testimony, coupled with her higher education degree, warrants a finding that plaintiff is capable of earning income in excess of her SSD benefits. Nonetheless, her testimony concerning her job search efforts and the very nature of her disability supports a determination that no income should be imputed by reason thereof.
One other possible method of imputing income is if her expenses as reported on her SNW exceed what she receives in SSD benefits. (Matter of Bruce L. v Patricia C., 62 AD3d 566, 567 [1st Dept 2009].) Those expenses, as reported in exhibit No. 9, total $9,914. Accordingly, plaintiffs income figure for CSSA purposes is $22,273.
The combined parental income is $66,875. Father’s proportionate share is 67% rounded, and mother’s is 33% rounded. Twenty-five percent of $66,875 is $16,719 rounded. Father’s share of that figure is $11,202 yearly (rounded), $933.50 monthly, $431 biweekly (rounded), or $215 weekly (rounded). Inasmuch as defendant did not, either in discovery despite due demand, or at trial, produce information or documentation showing the differential between his cost for a family versus an individual employer provided health care plan, he is ordered to pay 100% of those costs of covering the children. Otherwise he is ordered to pay 67% of the costs of the statutory add-ons, which shall be detailed in the findings of fact to be submitted to the court.
Marital Residence
The stipulated value of the marital residence is $168,000 (exhibit Nos. 3-4), against which there appears a home equity line of credit (HELOC) balance of $112,027 (exhibit No. 5), yielding an ostensible equity of $55,973. Both parties, who continue to live together, seek a buyout of the marital residence. Defendant, however, provided no evidence of his capability of buying plaintiffs equitable interest (other than as set forth below), and other factors (also detailed below) preclude such an award to him. For the following reasons, the marital residence is distributed to plaintiff free of any obligation on her part to buy out what, under ordinary circumstances, might be defendant’s equitable interest.
*657 The chronology of the failed business history detailed above [supra at 654-655), must be recalled. In particular, it must be remembered that, in 2006 in connection with the formation of Rookies I, defendant placed an addition lien on what then was his separate property, the marital residence.
Plaintiff established that the marital residence became marital property in September 2010 where, as part of a series of transactions entered into with Citizens Bank between that September and March 30, 2011 designed to consolidate defendant’s business debt with the marital debt allocable to the residence itself, defendant conveyed the residence to himself and plaintiff. (Exhibit Nos. 21, 22.) The March 30th HELOC, in the maximum amount of $117,000, provided moneys to repay the then existing $42,335 mortgage on the marital residence and the then existing $54,147 business debt, which had earlier been converted into a HELOC secured by the marital residence the previous September. On March 30, 2011, the balance on the March 30th HELOC was $96,502. (Exhibit L.) Plaintiff contends that these transactions result in a net credit in favor of her under the rationale of Nidositko v Nidositko (92 AD3d 653, 656 [2d Dept 2012]). This follows because, although one of the mortgages satisfied can be traced back to the purchase of the residence by defendant prior to the marriage, defendant provided no evidence concerning what he paid by way of a down payment for the property, nor did he provide a closing statement or other mortgage documents evidencing what that credit in his favor might have been. Accordingly, he failed to meet his burden to show what credit he might be entitled to.
Separately, the proof showed that one of the liens satisfied by the 2010 refinancing concerned an additional $80,000 lien against the marital residence, when it was still separate property, incurred to finance defendant’s second business venture with his cousin, Gus Votsis and the third investor. Inasmuch as the 2010-2011 refinancing concerned what had shortly before become marital property, the lien thereby constituted marital funds (in the form of a marital debt, Nidositko, 92 AD3d at 656, citing Loria v Loria, 46 AD3d 768, 770 [2d Dept 2007]). Although defendant might argue that the 2010-2011 series of transactions would be beyond the reach of the court under Mahoney-Buntzman v Buntzman (12 NY3d 415, 420-421 [2009]), the extraordinary history of financial malfeasance in this case requires consideration of it in determining whether any credit by reason thereof is warranted. (12 NY3d at 421-422, citing Do *658 mestic Relations Law § 236 [B] [5] [d] [11].) The court determines that no credit to defendant arising from the refinancing is appropriate.
Turning to plaintiffs claimed interest under the rationale of Nidositko as set forth in her summation (at 7), the court finds that subsequent events make it unnecessary to determine what credits are due her by reason of the 2010-2011 transactions. Plaintiff provided documentary proof that, when defendant’s third business fell into sales tax trouble, she paid off, in February 2012, the March 30th joint HELOC, in the amount of $95,210. Documentary evidence showed that her separate property contributions to this payoff consisted in part of $91,000, sourced in funds she saved since a child, and an inheritance from her father. (See exhibit Nos. 5, 37 showing the Feb. 2012 Cantella statement.) She also testified without contradiction that the balance of the $95,210 payoff figure came from her separate property funds. That left a balance of zero according to the February 3, 2012 Citizens Bank statement (exhibit No. 5), and that balance remained until a $3,400 withdrawal on August 22, 2012. Accordingly, she is entitled to a credit in the amount of her payments from separate funds “prior to the equitable distribution of th[is] asset[ ].” (MacDonald v MacDonald, 226 AD2d 596, 597 [2d Dept 1996]; see Fields v Fields, 15 NY3d 158, 166 [2010]; Swett v Swell, 89 AD3d 1560, 1562 [4th Dept 2011]; Mirand v Mirand, 53 AD3d 1149, 1150 [4th Dept 2008] [upholding credit to husband of a sum “representing his contribution of separate property in order to reduce the mortgage on the marital residence and to pay off a second mortgage in its entirety on the marital residence” reasoning that the “contribution retains its separate character and thus is not subject to equitable distribution”]; Moses v Moses, 231 AD2d 850 [4th Dept 1996] [same].)
Thereafter, and shortly before plaintiff filed a summons with notice on February 7, 2013 in a prior divorce action (exhibit No. 23) (discontinued by the filing of a stipulation of discontinuance on June 13, 2013, exhibit No. 24), a series of significant withdrawals was made by defendant. In November 2012, a $1,900 advance was taken out, leaving a balance after calculation of interest charges and payments of $4,507.99. In January 2013, another $13,425.93 was advanced, leaving a balance after adjustments of $11,337.49. And then in February 2013, an $80,000 advance was taken on the 7th (the day of the filing of the first summons with notice) and another $2,000 was *659 advanced on the 15th, leaving a balance of $93,380.25. Another $1,000 was advanced April 15, 2013; $2,000 in June 17, 2013; $1,000 on July 19, 2013; $2,000 on September 17, 2013 (the day before the filing of the summons with notice in this action, exhibit No. 25); $2,500 on October 1, 2013; $2,000 on December 19, 2013; $1,800 on January 7, 2014; $800 on February 24, 2014; $10,500 on March 21 and 28, 2014 ($10,000 of which was used to pay one third of the settlement of an action between Halftime and a third party for which defendant had no personal liability);[2] $1,700 on May 14, 2014; leaving a total balance at the time of trial of $112,028.68.
Although defendant in his trial testimony denied receiving service of the original summons with notice, this testimony was not credible as he signed a retainer agreement with defense counsel as early as April 3, 2013 (as revealed on his original Nov. 18, 2013 SNW), and he conceded on cross-examination that the $82,000 in withdrawals that February were in violation of the automatic orders in effect in the prior action. He also acknowledged that the funds currently are in a joint account with his sister, although despite due discovery demands he failed to produce documentary proof of the same either before or during trial. The documentary evidence of his accounts obtained via subpoena only show that the $82,000 never made it into defendant’s active accounts, unlike the other withdrawals he made, which statements show where many of the withdrawals were applied. The inference from this evidence, of defendant’s intention to secrete this sum into his joint account with his sister, is inescapable given his contumacious refusal of properly interposed discovery demands for the same.[3] The HELOC statements were obtained only by subpoena a few days before trial, putting plaintiff, who had deposed defendant in vain on these issues twice this past June, in an untenable trial preparation position. In other words, the court finds that, the withdrawals totaling $112,027 were made either in contemplation of an action for divorce (cf. Biagiotti v Biagiotti, 97 AD3d 941, 944 [3d Dept 2012] [“court may consider transfers made in contemplation of a matrimonial action as one of the factors in equitably distributing marital property”], citing Domestic Relations Law *660 § 236 [B] [5] [d] [13]), or in direct violation of the automatic orders in either of the two divorce actions.
A further significant factor at play here is defendant’s “removal” of plaintiff’s name from the new joint HELOC agreement/note after plaintiff paid off the previous substantial debt of defendant’s business and the marital residence with her separate property in early 2012. Defendant’s exhibit L, purporting to be a secondary mortgage loan (HELOC) agreement, was executed by defendant alone on October 26, 2010. The record is unclear exactly how plaintiffs name was “removed” from the note (or why it omitted plaintiff as obligor). The mortgage, exhibit No. 22, recorded in the clerk’s office, plainly lists both parties as mortgagors, and contains plaintiffs notarized signature. The exhibit No. 5 subpoenaed Citizens Bank statements dating from January 2012, however, only list defendant’s name as obligor. However, it was undisputed at trial that plaintiff remains liable to Citizens Bank on the duly filed HELOC note and mortgage. Whether this supports plaintiffs contention of fraudulent removal of plaintiff’s name on the HELOC, or a bank mistake in not conforming the note/agreement to the mortgage, is of no moment. Defendant admitted in his testimony that he took out the HELOC solely in his name, and that he made the indicated withdrawals, most of which he conceded were in violation of the automatic stay/orders, and as stated above plaintiff remains liable.
It is also of relevance that plaintiff paid, from her then separate property funds (in the Cantella account), for various improvements, chiefly to the living room and kitchen, which stipulated expert testimony (exhibit No. 4) established increased the value of the property by $10,000. Accordingly, under ordinary circumstances where a buyout of the opposing party’s equitable interest is concerned, she would be entitled to a credit in that amount if the value at the date of the marriage was at least $10,000 less than the value at the date of commencement. Because plaintiff did not prove the value of the marital residence at the date of the marriage, however, such credit cannot be awarded.
For the following reasons, an award outright of the marital residence to plaintiff without contribution toward the difference between its value and the outstanding balance of the HELOC is justified. (Mahon v Mahon, 129 AD2d 684 [2d Dept 1987].) Her credits as set forth above well “exceed[ ] . . . [defendant]^ share in the equity of the marital residence.” (Hen *661 ery v Henery, 105 AD3d 903, 904-905 [2d Dept 2013].) Also appropriate, as stated above (n 3), is the imposition of a constructive trust on the $82,000 secreted from plaintiffs reach in February 2013, which amount must immediately be repaid into the Citizens Bank HELOC, together with interest from the date of withdrawal, or to plaintiff together with the same interest. (Elkaim v Elkaim, 176 AD2d 116, 119 [1st Dept 1991], citing Coco v Coco, 107 AD2d 21 [1985]; Reiner v Reiner, 100 AD2d 872 [1984].) Furthermore, the balance of the $112,028.68 HELOC debt must be repaid to Citizens Bank or plaintiff “in full before transferring title to the plaintiff’ (Ropiecki v Ropiecki, 94 AD3d 734, 735-736 [2d Dept 2012]), and within 45 days of service of this court’s decision and order. Whether or not such performance is realized, title shall be transferred to plaintiff prior to any bankruptcy filing with the additional provision that defendant hold plaintiff harmless from any liability under the HELOC mortgage (she has no liability under the note, exhibit L). This will permit her alone to redeem the house without interference from defendant. Defendant shall have a 50% credit for any amounts he paid since commencement toward the carrying costs of the marital residence, whether sourced in the HELOC withdrawals or his separate funds, and both counsel shall arrive at a stipulation regarding the same.
Credit Cards and Other Debts
All credit card debt in defendant’s name is distributed to him. Any credit card and debt in plaintiffs name is distributed to her (none was revealed at trial). All debts referred to in defendant’s testimony, whether owing to the sale of Rookies II or otherwise, not disclosed pretrial and never detailed at trial with any particularity, is distributed to defendant, and defendant shall hold plaintiff harmless and indemnify her from any such debts.
Vehicles
The Harley Davidson, indisputably marital property, is hereby ordered sold and the proceeds distributed equally to the parties. Inasmuch as defendant has been ordered to repay the HELOC in its entirety the 2014 Nissan Altima, purchased post commencement, is hereby declared his separate property not subject to distribution. The 2011 Nissan Rogue held jointly is distributed to plaintiff together with all associated expenses and debts. Plaintiff shall hold defendant harmless and indemnify him in connection with this distribution, and defendant shall immediately transfer title to plaintiff in her name alone. In view of the distribution of the marital residence and HELOC debt, *662 plaintiff’s requested credit of $3,500 is denied. In any event, plaintiff’s calculation of the value of the car is wholly unsupported by appropriate expert or other proof.
Personal Property
Personal property shall be distributed as the parties may agree. In the event of no agreement the parties are ordered to avail themselves of the services of the Center for Dispute Settlement. Certain tools, defendant’s bed, the television, and golf clubs were acquired by defendant prior to the marriage and are declared his separate property.
The Accounts, Annuity, and Retirement
Defendant has no retirement accounts and plaintiff seeks no distribution of his other accounts. Plaintiff has an IRA retirement account with MetLife worth $66,386 which accrued during her employment with the University of Rochester. Defendant wholly failed in his burden of proof to show the marital portion of the account subject to distribution. As pointed out in plaintiffs summation, however, many of her years of employment with the University of Rochester occurred prior to the marriage. Further, defendant provided no proof of value at the time of commencement. Exhibit K (plaintiffs updated SNW) does not identify value at the time of commencement or at the time of the marriage, or even refer to this asset.
The court declines to award 50% of the whole to defendant as requested.
“It is well established that a spouse’s pension constitutes marital property only to the extent that the corpus of the fund accumulates during the marriage and prior to the commencement of the divorce action (see, Domestic Relations Law § 236 [B] [1] [c]; Majauskas v Majauskas, 61 NY2d 481. . .).” (Cohn v Cohn, 155 AD2d 412, 413 [2d Dept 1989].)
Contrary to defendant’s argument, however, he had the burden to establish value. (Grenier v Grenier, 210 AD2d 557, 558 [3d Dept 1994] [“The burden of proving a pension’s value is on the party seeking an equitable share of the pension” which “is typically established by actuarial evidence”]; Michalek v Michalek, 114 AD2d 655, 657 [3d Dept 1985] [“plaintiff has the burden, as the one seeking a portion of the pension interest, of establishing the value of said interest, usually by actuarial evidence, as well as evidence of the plan itself, establishing the pensioner’s rights”].) In Biagiotti v Biagiotti (97 AD3d 941 [3d Dept 2012]), the Court upheld the trial court’s refusal to distribute any portion of an IRA on a similar failure of proof.
*663 “The record does not include any value for defendant’s three IRAs for any time period between the date of commencement of the action and the date of trial. As Supreme Court must use a valuation date within that time frame (see Domestic Relations Law § 236 [B] [4] [b]; Mesholam v Mesholam, 11 NY3d 24, 28 [2008]), the court could not assign a value to these assets. The burden of proving the value of a pension rests on the party seeking an equitable share of that pension (see Parrish v Parrish, 213 AD2d 928, 928 [1995]; Grenier v Grenier, 210 AD2d 557, 558 [1994]). Because plaintiff did not meet her burden, the court did not err in declining to distribute any portion of defendant’s IRAs to plaintiff.” (97 AD3d at 944 [emphasis supplied].)
Accordingly, the court declines to distribute plaintiffs pension interests as described above. (Parrish v Parrish, 213 AD2d 928 [3d Dept 1995]; see also Kazel v Kazel, 2 AD3d 1267, 1269 [4th Dept 2003] [“Because plaintiff did not seek to establish the value of the preretirement death benefits in the divorce action, and the court did not grant her a share in those benefits, we conclude that the court properly denied her application to modify the QDRO to award her a share of the preretirement death benefits” (citation ommitted)], affd 3 NY3d 331 [2004]; LaBarre v LaBarre, 251 AD2d 1008 [4th Dept 1998] [wife seeking interest in business had burden of establishing its value]; Murtari v Murtari, 249 AD2d 960 [4th Dept 1998] [where husband failed to offer proof of value, lower court properly declined to make distributive award to him of wife’s enhanced earning capacity attributable to Master’s degree earned during marriage]; Wojtowicz v Wojtowicz, 171 AD2d 1073 [4th Dept 1991] [same].)
There were two Cantella accounts, one a joint account (#xxxxxxx) that was closed in 2010, and another account in plaintiff’s name only (#xxxxxxx) that, with two exceptions, contained her separate property consisting of premarital savings, gifts from her father, and inheritance funds. (Robertson v Robertson, 186 AD2d 124, 125 [2d Dept 1992].) Plaintiff concedes that two joint tax refunds were deposited into this account during the marriage, one in 2004 for the 2003 tax year and one in 2009. (Exhibit No. 37 as supplemental with the subpoenaed Boston records.) These two events, however, do not constitute commingling of marital funds with plaintiff s separate funds. In the absence of an agreement to the contrary (e.g. *664 Lusk v Lusk, 55 AD3d 408 [1st Dept 2008]), joint tax refunds generally are “regarded as separate property of which each party is entitled to a pro rata share.” (Nimkoff v Nimkoff, 120 AD3d 1099, 1100 [1st Dept 2014]; see generally Angelo v Angelo, 74 AD2d 327, 330-334 [2d Dept 1980].) The fact that, on these two occasions, defendant’s separate property pro rata share was deposited into plaintiffs separate Cantella account is of no moment. In any event, defendant admitted at the end of his direct examination that the Cantella account was plaintiffs separate property in large measure. Therefore, this account contained plaintiff’s separate property and any appreciation during the marriage occurred solely due to market forces. (Robertson v Robertson, 186 AD2d at 125-126.)
Plaintiff also had, at the time of marriage, a Sun Life Financial annuity (exhibit No. 10), which defendant stipulated during plaintiffs direct examination to be her separate property. There was also a stipulation at the same time that any appreciation in the account during the marriage was owing to market forces.
Accordingly, it is curious that defendant now contends in summation that both accounts, Sun Life and Cantella (#xxxxxxx), are marital by reason of the fact that the activity in these accounts was reported to the federal and state taxing authorities on joint tax returns. Defendant relies on Foti v Foti (114 AD3d 1207 [4th Dept 2014]). This reliance is misplaced, however.
First, defendant cannot now avoid his stipulations at trial in regard to the Sun Life and Cantella accounts by taking a contrary position in summation. The stipulation had the effect of making unnecessary any further proof of those accounts’ character as separate property, and therefore to permit defendant to now make an argument that they are, in reality, marital property would deny plaintiff due process.
Nor can defendant’s position on the merits be sustained on this record. The Foti case determined that this court correctly found that the wife had established on summary judgment that her father’s gift of certain real estate and business entities to her constituted, at the time of the gifts, separate property. The Court found, however, that the husband created an issue of fact of “commingling” on summary judgment by virtue of the fact that the parties “reported her interest in the entities as tax losses.” (114 AD3d at 1208.) Thus, despite the Court’s citation to Mahoney-Buntzman v Buntzman (12 NY3d 415, 422 [2009] [“party to litigation may not take a position contrary to a posi *665 tion taken in an income tax return”]), the Court did not search the record and award summary judgment to the non-moving party as it well could have if so inclined. (Remet Corp. v Estate of Pyne, 112 AD3d 1313 [4th Dept 2013]; see Dunham v Hilco Constr. Co., 89 NY2d 425, 429-430 [1996]; CPLR 3212 [b]; see generally Lee v City of Rochester, 254 AD2d 790, 791 [4th Dept 1998].)
Because the Appellate Division did not grant summary judgment to the non-moving party, the marital versus separate property issue in Foti necessarily demands fact-finding. In other words, the choice to file jointly and report the tax losses on the gifted business entities is not conclusive. (Cf. Angelo v Angelo, 74 AD2d 327, 333 [2d Dept 1980] [“The filing of a joint income tax return must therefore be viewed in the circumstances of the general financial background of the marriage; moreover, it should be construed as a response to the tax statutes designed to confer a benefit to the married couple. In itself the exercise of the option by the spouses to file a joint return should not be interpreted as the conclusive memorial of the intent to create a joint tenancy or to make a gift by one for the other” (emphasis supplied)].) The Angelo case is remarkable because it involved the question of ownership of the joint tax refund itself. The fact that, as set forth above, the joint refund is considered separate property of each spouse entitling each to his or her pro rata share, does not, without more, establish commingling of separate funds with marital funds. If the election to file jointly does not “conclusively” imply a gift of one spouse’s pro rata share to the other spouse, filing jointly cannot, by itself, imply a gift of the underlying separate accounts partially generating a return (or reduction in tax indebtedness). Something more is required to evidence an intent to create a joint tenancy in the accounts, which in this case are substantial. (Cf. Imhof v Imhof, 259 AD2d 666, 667 [2d Dept 1999] [“(s)eparate property can be transmuted into marital property when the actions of the titled spouse demonstrate his intent to transform the character of the property from separate to marital”].)
That “something more” was not adduced at trial. Defense counsel began her direct examination of defendant by announcing that she would not ask him questions about the joint tax returns. Nor was any evidence presented, by word or deed, of an intent on plaintiff’s part to convey her separate accounts into marital property, save the filing of the joint returns themselves. Although plaintiff might have evinced an intent to *666 transform the separate character of property into marital by a number of devices, including placing the properties in both names with a right of survivorship, or combining the two separate accounts in the joint Cantella account before it was closed (Geisel v Geisel, 241 AD2d 442, 443 [2d Dept 1997]), there was no evidence that she did so or that she ever intended to do so. The fact that plaintiff used the separate Cantella account to fund improvements to the house when it was still defendant’s separate property, and to support the marital household when defendant was unemployed, makes only her withdrawals from the account for those purposes marital (Loria v Loria, 46 AD3d 768, 770 [2d Dept 2007]), not the funds remaining in the account. (Chernoff v Chernoff, 31 AD3d 900, 903 [3d Dept 2006] [“commingling the corpus with marital funds transmutes the separate property into marital property for purposes of equitable distribution, but commingling only a portion of the income produced by the corpus does not transmute the corpus which has never been commingled” (citation omitted)]; see Armstrong v Armstrong, 72 AD3d 1409, 1415 [3d Dept 2010] [“commingling only a part of separate property does not necessarily result in other separate property that has not been commingled being transmuted to marital property”]; Spencer v Spencer, 230 AD2d 645, 647 [1st Dept 1996] [“fact that the plaintiff may have made withdrawals from his separate account to pay marital expenses does not alter this conclusion” that the underlying account was separate property]; Feldman v Feldman, 194 AD2d 207, 216 [2d Dept 1993] [“husband’s admission that he drew upon bank accounts containing separate funds to pay bills and support both parties does not change the nature of the funds”].)
The court is fortified in its conclusion that the Appellate Division in Foti did not determine conclusively that the filing of a joint return transmutes gifted separate property business entities into marital property, as opposed to simply raising an issue of fact whether the judicial estoppel should be applied, by decisions from other states. For example, in Holden v Holden (667 So 2d 867, 869 [Fla Dist Ct App 1996]), the court held that “[b]y itself, the filing of a joint federal income tax return that includes the separate non-marital income of one spouse does not convert the separate income into marital property,” reasoning that any contrary holding “would force married persons to file separate income tax returns, and to pay higher income taxes, simply to protect the non-marital status of their separate property.” (See also Cerny v Cerny, 440 Pa Super 550, 554, 656 A2d *667 507, 509 [1995] [“act of filing a return is not a financial activity . . . One does not create or alter property by filing a tax return, as one does in opening or contributing to a bank account or other investment instrument. A tax return is merely a business record, and has no independent capacity to create or preserve wealth”]; Matter of Marriage of Thomas, 199 SW3d 847, 864 [Mo Ct App 2006] [“the fact that the parties’ joint income tax returns reflect income, expenses, and interest relating to the Corporation . . . does not illustrate an intention to transmute Husband’s interest in the Corporation into marital property”].)
Similarly, federal authority holds that federal tax law “ ‘creates no property rights but merely attaches consequences, federally defined, to rights created under state law.’ ” (United States v National Bank of Commerce, 472 US 713, 722 [1985], quoting United States v Bess, 357 US 51, 55 [1958]; see Callaway v Commissioner of Internal Revenue, 231 F3d 106, 117 [2d Cir 2000] [“filing of joint tax returns does not alter property rights between husband and wife. . . . Callaways’ decision to file jointly, see I.R.C. § 6013(a), had no effect on James’s separate ownership of his Mountain View items”]; Zeeman v United States, 395 F2d 861, 865 [2d Cir 1968] [Internal Revenue Code (26 USC) § 6013 (a)’s purpose “was to give all married persons the same tax reward on combined income that married persons in community property states enjoyed before its enactment, (which enactment) was accomplished without changing their private ownership rights”]; McClelland v Massinga, 786 F2d 1205, 1210 [4th Cir 1986] [“mere filing of a joint tax return by a husband and wife does not render the property taxed or the tax paid joint property”]; Matter of Hejmowski, 296 BR 645, 648 [WD NY 2003] [describing Callaway as holding that “if one spouse has ownership of an asset, such as a business, that has tax attributes for the two taxpayers jointly, the fact of joint filing does not give the other spouse a property interest in the business”], disagreed with on other grounds Matter of Duarte, 492 BR 100 [ED NY 2011].) Nothing in Tax Law § 651 suggests a contrary result.
By reason of the immediately foregoing discussion, the election by the parties in this case did not, by itself, “advance a position” that might be imagined to be contrary to plaintiffs position here that the two accounts are her separate property. The contrary positions in Mahoney-Buntzman were of an entirely different character than that posited here. In that case, the parties were married in 1993. Prior to the marriage, the *668 husband “had an interest in ... a real estate development company he founded with his father in 1971.” (12 NY3d at 418.) The husband also, in 1983, “founded another company, . . . 80% of which he sold to . . . [the real estate company] in 1989.” (12 NY3d at 418.) After his marriage, “[i]n 1998, husband entered into an agreement with his father whereby he agreed to relinquish his stock ownership in both corporations in exchange for a lump sum payment” which under the agreement would be “increased by 17%” by virtue of the fact that it would be reported on an IRS Form 1099 and further be reported “as ordinary income rather than as a sale of stock.” (12 NY3d at 418-419.) In accordance with the agreement, the proceeds of the sale, some $1.8 million, “was received by husband during the marriage [thus making it marital income] and reported on the parties’ joint income tax return as self-employment business income.” (12 NY3d at 419 [emphasis supplied].)
In the matrimonial litigation, the husband sought a ruling that the proceeds resulted from a sale of stock of his separate real estate business entity, and thus constituted his separate property exempt from equitable distribution. As is readily discerned, this was a substantial “change of position” from that taken on the tax return. The tax returns declared the ordinary income character of the proceeds when received by the husband, which created an estoppel, according to the Court of Appeals, precluding husband’s separate property argument. (12 NY3d at 422.) Indeed, because the tax returns made an affirmative representation concerning the nature of the proceeds as Form 1099 ordinary income, the result would have been the same had the husband reported the transaction on a separate individual tax return. Thus, the election to file jointly was of no moment.
A similar affirmative declaration on the tax returns was made in Winship v Winship (115 AD3d 1328 [4th Dept 2014]). At trial, husband sought a ruling that the business entity in question was actually owned by his father and was inherited prior to the date of commencement of the matrimonial action. The husband’s ownership argument was foreclosed under Mahoney - Buntzman because “the parties depreciated [the entity]’s equipment and property, and identified plaintiff as its ‘proprietor,’ ” thus affirmatively representing that husband owned the entity (at least in part). (Winship, 115 AD3d at 1330.) That the return effectively made a representation of husband’s ownership resulted “inasmuch as a party cannot depreciate property that he or she does not own.” (Winship, 115 AD3d at 1330.) Again, *669 the result would have been the same had the husband elected to file separately in the year in question.
No such affirmative representations about the character of income or the ownership of property occurred by reason of the parties’ election to file joint tax returns in this case. Accordingly, the court finds that defendant’s claim that the property was transmuted into marital property by reason of the tax returns fails for want of preponderant proof of the same.
Attorneys’ Fees
Although plaintiff appears on this record to be the monied spouse, an award to her is appropriate because of defendant’s dilatory, evasive, and at times incredible discovery practice. (See the many times during his trial testimony that he was forced to recant his deposition testimony and other representations of his two statements of net worth.) This conduct forced plaintiff to expend considerable effort to obtain material and necessary subpoenaed records. Plaintiff requests that a full $23,000 + award be made to her. Given defendant’s modest financial circumstances, however, as well as the respective financial circumstances of the parties, an award of $7,500 in attorneys’ fees is made to plaintiff.

. Halftime sued the buyer in May 2012 (exhibit No. 33), and eventually obtained a default judgment in the amount $165,367.95 on October 16, 2012. (Exhibit No. 36.) No efforts to collect on the judgment have been initiated.

. At least, defendant never proved he had personal liability for this debt.

. Accordingly, this joint account, or the account in which that sum is held wherever it may be, is “properly held the subject of a constructive trust as a remedy to defendant’s effort to place marital property out of plaintiffs reach.” (Elkaim v Elkaim, 176 AD2d 116, 119 [1st Dept 1991], citing Coco v Coco, 107 AD2d 21 [1985]; Reiner v Reiner, 100 AD2d 872 [1984].)